Thompson *v.* Inhabitants of Pittston.

———————◆———————

DANIEL A. THOMPSON *vs.* INHABITANTS OF PITTSTON.

*Commutation—statute ratifying acts of towns in voting money for—unconstitutional. Exceptions—questions raised under.*

So much of c. 55,* of Pub. Laws of 1869, as attempts to ratify the action of towns in voting money for the payment of the commutation fees of individuals drafted into the public service, is beyond the sphere of constitutional legislation.

The defendant town voted to pay each drafted citizen who paid the commutation fee, three hundred dollars ; and the vote was ratified by an act of the legislature. In an action to recover the sum voted, the presiding judge instructed the jury—" that the only question they were to determine was whether the moderator and clerk were qualified, and if they should find that those officers were duly sworn, their verdict should be for the plaintiff;" and the verdict being for the plaintiff, the defendant alleged exceptions, *Held,* That the exceptions raised the validity of the ratifying act.

———————

*Pub. Laws of* 1869, *c.* 55. Sect. 1. The past acts and doings, regular in form of cities, towns, and plantations, in offering, paying, agreeing to pay, and in raising and providing the means to pay commutations to drafted men, and all notes and town orders, given by the municipal officers of any city, town, or plantation in pursuance of a previous vote at a meeting regularly called and held, for the benefit of drafted men, are hereby made valid.

Sect. 2. All contracts heretofore made by the municipal officers of any city, town, or plantation, that has voted at meetings called and held to raise money to pay commutations thus voted, and all contracts heretofore made by said officers, or their duly authorized agents, with third persons, corporations, or associations, for the purpose of raising means to pay such commutations so voted are hereby made valid.

Thompson *v.* Inhabitants of Pittston.

ON EXCEPTIONS.

ASSUMPSIT to recover of the defendant town three hundred dollars, alleged to be due to the plaintiff by virtue of votes passed at a meeting held on July 20, 1863, of the following tenor:

" *Voted*, that every man drafted in the town of Pittston on the sixteenth day of July (inst.), as the quota of said town, and held to serve in the service of the United States and considered liable to go and serve, shall be paid and receive three hundred dollars from said town of Pittston. Each drafted man to have the privilege to go and serve, send a substitute, or pay his three hundred dollars commutation. But if found liable to do either, he is to have and receive three hundred dollars from said town of Pittston.

" *Voted*, that the selectmen be hereby authorized and instructed to hire or otherwise obtain said three hundred dollars to each drafted man from or belonging to said town of Pittston, found to be liable and obliged to go and serve, send a substitute, or pay commutation under said draft forthwith, and pay it, $300, over to such drafted men, and every man drafted and found to be liable, and obliged to go and serve, etc., as above."

The defendants raised questions in regard to the legality of the town meeting, because the record did not show that moderator and clerk were sworn, and requested certain instructions thereon, which the presiding judge declined to give.

The presiding judge instructed the jury

That the warrant, as amended, was sufficient; that the only question they were called upon to determine, was whether the

---

Sect. 3. All contracts heretofore made by such municipal officers, or by third persons in behalf of any city, town, or plantation, but without previous authority therefor, to pay commutations to such drafted men, or to raise money to pay such commutations, may be ratified or confirmed by said city, town, or plantation.

Sect. 4. The doings of any city, town, or plantation, in voting to pay, or in raising money to pay commutations, may be ratified and confirmed by said city, town, or plantation.

Sect. 5. All taxes that have been assessed to raise funds to pay commutations or to fulfill contracts for the objects named in this act, are hereby made valid.

Sect. 6. Nothing in this act shall affect, in any way, the equalization of municipal war debts.

Thompson v. Inhabitants of Pittston.

moderator and clerk were sworn; and that if they should find that those officers were duly sworn before entering upon the discharge of their duties, their verdict should be for the plaintiff.

The verdict was for the plaintiff, and the defendants alleged exceptions.

*J. Baker*, for the plaintiff.

1. The validity of the act (Pub. Laws of 1869, c. 55) is not raised in the exceptions, or involved in the rulings or instructions of the court; and so is not now open to the defendants.

2. But, if it is, there is no well-grounded objection to its validity. The draft was made under the act of congress, passed March 3, 1863, c. 75, and § 13, is as follows:

" Any person drafted and notified to appear as aforesaid may, on or before the day fixed for his appearance, furnish an acceptable substitute to take his place in the draft; or he may pay to such person as the secretary of war may authorize to receive it, such sum, not exceeding $300, as the secretary may determine, for the procuration of such substitute; which sum shall be fixed at a uniform rate by a general order, made at the time of ordering a draft for any State or territory; and thereupon such person, so furnishing a substitute, or paying the money, shall be discharged from further liability under the draft."

When a person is drafted and accepted, he may do either of three things:

1. He may go into the service himself.

2. He may send a substitute.

3. He may pay commutation money, with which the United States themselves undertake to procure a substitute.

Congress is the sole representative of the United States in relation to the war-making powers, the embodiment of its sovereignty, and has exclusive jurisdiction of that subject under the constitution. United States Constitution, § 8, Art. 11 to 16; Opinion of Judges, 52 Me. 596.

And congress, by this statute, gave the election to every drafted man which of the three courses he would adopt, declaring that the

payment of the money was just as legal, acceptable, patriotic, and valuable in carrying on the war and crushing the rebellion, as either of the others.. Of this, congress was the . exclusive judges. The question, therefore, was *res adjudicata ;* and no other tribunal or power, whether individuals, branches of the government, courts or States, has any right, authority, or power to declare otherwise.

The various statutes ratifying the votes of towns to pay bounties to drafted men who entered the service themselves, or sent substitutes, have been repeatedly sanctioned by this court, and fully commits it to sustaining the act of 1869. *Barbour* v. *Camden,* 51 Maine, 608; Opinion of Judges, 52 Maine, 596; *Barker* v. *Dixmont,* 53 Maine, 575, 576; *Winchester* v. *Corinna,* 55 Maine, 9; *Hart* v. *Holden,* 55 Maine, 572.

*L. Clay,* for the defendants.

BARROWS, J.   The foundation of the plaintiff's claim fails utterly, if c. 55, of the Laws of 1869, entitled, " An act to render valid certain doings of towns, in voting commutations," is found to be clearly beyond the limits of constitutional legislation.   The presumption being that it was not so, the judge at *nisi prius* proceeded in accordance with the usual practice, upon the assumption that the act was valid and binding, and instructed the jury, among other things, " that the only question they were called upon to determine, was whether the moderator and clerk were duly sworn," and " that if they should find that those officers were duly sworn before entering upon the discharge of their duties, their verdict should be for the plaintiff."   To this the defendants except.

It is manifest that the positions now taken by the plaintiff's counsel that the validity of the act is not involved in the rulings or instructions of the court,' and that no question of its validity is raised by the exceptions, cannot be maintained.   The instructions complained of did not involve the validity of the act, for unless the act was valid, the verdict could, in no event, be for the plaintiff.|

We come, then, directly to the question of the validity of the act.

It has been for some time past under consideration in other cases. It must be met and decided, with the care and caution which its importance demands.

The limits of the constitutional power of the legislature to raise money by taxation, or to authorize towns to make grants of money which must be raised by taxation, have been recently discussed by this court. See Opinions of the Judges, 58 Maine.

We start, then, with the proposition which we think no one will gainsay, that if the grant made by vote of the town is purely a gratuity to an individual, and it is impossible to believe or imagine that the public can gain anything thereby, or that the public welfare can be thereby in any manner subserved, the grant is not lawful, and no legislation can make it so. We think it susceptible of positive demonstration, that the public, or the general government, which in this matter represented the public, could by no possibility gain anything by the action of certain towns in voting to drafted men sums required to pay commutation, or to reimburse the drafted man for moneys paid for that purpose.

In the emergency then existing, the country, the public, the government which represented both, had a right to the services of as many able-bodied men, within certain ages, as were necessary to protect us all against the machinations of treason,—had the right to draft from the whole number of those fit for military duty, so many as were required for that purpose. In the law regulating the draft, a certain sum was fixed and designated, the payment of which, by the drafted man, should be deemed an equivalent to the rendering of personal service or the sending of a substitute. The payment of three hundred dollars constituted that equivalent.

But when an able-bodied man was drafted and accepted, the government held him for the performance of one of the three alternatives. He must either go himself, or send a substitute, or pay the three hundred dollars. To do one of these three things was a duty which he, as an individual, owed to the country, and his own proper person was pledged for the performance of one of them. If he declined to go, or send a substitute, before he could be relieved,

he must pay the three hundred dollars. It was his individual debt. By the draft and acceptance the public had secured the performance by him of one of the three alternatives. It is as plain as anything in arithmetic, that by no possibility could the public gain anything by having his town take his place in the payment of the money.

There was room to suppose that the grant of a bounty to him, or to his substitute, actually entering the service, might benefit the public by showing the sympathy of his fellow citizens, and thereby encouraging the soldiers to render better service. But three hundred dollars can be no more than three hundred dollars, let who will pay it. The only possible effect of the vote of the town is to substitute the money of the town for that of the drafted man.

Without such action the public would have either the service or its equivalent in money.

With it the public can have only the money equivalent. We cannot imagine a case which would be more clearly and simply the assumption and discharge of a single citizen's liability, without the remotest possibility of any benefit to the public accruing therefrom. It can wear no other aspect until it can be shown, either that the money was better than the service for which the law of the United States declared it to be simply an equivalent, or that three hundred dollars of the town's money would go further in the purchase of such service, than three hundred dollars from the drafted man.

The able counsel for the plaintiff makes no futile attempt to show how it could be possible that some benefit to the public could be derived from such a grant of public money. The only suggestion he has to offer, in support of the validity of the statute, is that this court is committed to that doctrine by reason of having recognized the constitutional authority of the legislature to pass laws making valid the acts and doings of towns in voting the payment of bounties to volunteers, drafted men, and substitutes, who actually entered the service. Thus far this court has gone and no further.

But this falls very far short of the proposition which we are now called upon to entertain.

The difference between that class of cases and the present is radical and essential. Test them by the statement of principles with which we started. The difference is this. In the case of the payment of bounties to those actually entering the service, the public had the benefit of both the service and the money granted, so far as the latter might be supposed to operate as a stimulus to greater exertion on the part of the soldier. But in the case of money voted for commutation, the town's money only goes instead of an equal sum which the drafted man must pay, if he would avoid rendering either personally or by substitute the service for which the law deems the money simply an equivalent. The public does not get from any quarter both the service and the money as it does in the case of money paid for bounties to those actually entering the service.

As we have just seen, the drafted man alone can, by any possibility, derive any benefit from the payment. What is given to the public in money is but an equivalent for the service, of which the country is by the same act deprived, and no remainder of benefit to the public is left. Now, in the case of the payment of bounties, it was not difficult to believe that the soldier, cheered by such substantial manifestation of the patriotic sympathy of his neighbors, and of their willingness to coöperate with him for the common defense, and freed from anxiety as to the maintenance of those who might be dependent on him, and relieved to a certain extent from the annoying sense of personal pecuniary loss, might, and would render more efficient service to the country than he would be able to do, if he went forth to his work bearing the whole burden of his private cares with him. There were, at least, a possibility of a common benefit growing out of the grant, which is not found here.

And herein is the fundamental difference between grants for bounties to soldiers who took the field, and grants to individuals to enable them to avoid taking it. No case can be found, in which this court has sanctioned the imposition of a public burden for purely private benefit and advantage.

We have never yet gone so far as to sustain an individual's claim

to reimbursement for furnishing a substitute, where the vote of the town has taken that form. No such case has ever come before us.

That case was fully considered in Massachusetts, and an elaborate opinion, adverse to the claim rendered in *Freeland* v. *Hastings*, 10 Allen, 570, in which (page 588) we find the following emphatic language. " But the other and more decisive objection to the repayment by the town of money paid for substitutes is, that if the language of the statute would warrant the raising of money for such purpose, the legislature have no power to confer such authority on the town."

This is followed on page 589 by a train of reasoning, which it would be found very difficult, if not impossible, to refute. And that reasoning applies even more forcibly and directly to such a claim as this.

In *Barbour* v. *Camden*, 51 Maine, 608, that portion of the vote of the town, the ratification of which was sanctioned by the court, was as follows : " . . . to pay to each such citizen so drafted the sum of three hundred dollars when mustered into the service of the United States, or to his substitute, when so mustered," and the case finds that " the plaintiff paid the substitute the town bounty of three hundred dollars and took said substitute's order on the town of Camden for that amount," in exchange for which the selectmen gave the plaintiff the order on which the suit was brought. So that the case was neither more nor less than a claim for the payment of a bounty to a soldier in the field. It is not easy to perceive how anything in the other authorities cited can be perverted to the support of the present plaintiff's claim.

We are fully sensible that the duty imposed upon this court by the constitution and laws of this State of passing upon the acts and doings of the legislature, where they affect the rights of parties litigant before us, and of declaring such acts void of legal force and effect if they shall be found to be in contravention of the fundamental law of the State, ought always to be discharged with the utmost circumspection ; that never, except when the bounds of constitutional authority have been clearly passed, should the power

vested in us be exercised; that due force is to be given to the presumption that the constitutional limits have not been transgressed, and only when this presumption is fully overcome should the act be pronounced void.

But while we bear these things in mind we feel bound to declare our conviction that a law imposing a public burden, for purely private benefit, without the possibility of any corresponding public advantage, is a clear violation of the constitutional guaranties of the right of private property; that the action of towns in voting money for the payment of the commutation fees of individuals drafted into the public service is justly liable to this objection, and that, as a consequence, any attempt on the part of the legislature to authorize or ratify such action on the part of the towns is beyond the sphere of constitutional legislation.

Accordingly we hold the attempted ratification of these acts and doings in c. 55 of the Laws of 1869, to be devoid of legal and binding force. *Exceptions sustained.*

APPLETON, C. J.; CUTTING, WALTON, and DANFORTH, JJ., concurred.

DICKERSON, J., concurred in the result, and presented his views as follows:

DICKERSON, J. It seems to me to be erroneous to regard the act of congress as placing the payment of money upon the same footing with rendering military service. While such construction is not required by the terms of the act, it is contrary to its spirit, to reason and public policy, and to the contemporaneous judgment of the country.

The government needed men rather than money, personal service rather than pecuniary aid. The object of the act was to raise men, as appears from its title and other provisions. The difference between rendering military service and the payment of money is obvious; if every drafted man had rendered military service, the integrity of the republic would have been assured, while if every

such man had paid $300 dollars, instead of rendering such service, rebellion would have triumphed. It is the difference between the man who performed his duty to his country, in the hour of her greatest peril, and the man who paid a fine for not doing such duty. The ranks of the army were decimated to an extent substantially corresponding in numbers to the number of drafted men who were prevented from joining it by the payment of this fine. For every soldier disabled by sickness or wounds, exempted from further immediate service by the expiration of his term of enlistment, killed in battle, or suffering death from wounds or disease, the government needed and had a right to a fresh recruit. To this call of the country every drafted man who would neither render personal service nor furnish a substitute responded, " I will pay my fine." The effect of such responses upon the soldiers in the field and the recruiting service was so disastrous, that congress was soon impelled to repeal the odious provision of the act under consideration. The intelligent judgment of the country at the time made a broad discrimination in its estimate of these two classes of drafted men.

It is a misinterpretation of the true intent and meaning of the act of congress, as well as a misconception of the exigencies of the country, and a perversion of contemporaneous history, to hold that the payment of $300 under that act was equivalent to the performance of military service. The meaning of the act is the same as though it had read, "Every drafted man who does not enter the military service of the country, or furnish a substitute, shall pay a fine of $300." So far from being equivalent to personal service, the payment of the money was imposed as a military fine for not rendering such service. Worcester defines the word "fine" to mean, "a sum of money paid for obtaining a benefit, favor, or privilege." This is precisely what the defendant did when he paid the $300 for which he now claims to be reimbursed. It was not paid to promote the public advantage or welfare, but to purchase his own exemption from the performance of a personal duty, to enable him to enjoy his ease and pleasure, advance his private interests, and escape the privations, sufferings, and perils of war. When a

drafted man elected to pay $300 in lieu of entering the service or furnishing a substitute, such payment stands upon the same footing as the payment of a fine imposed by law for not attending a military training under a State law, or by judgment of a court-martial for other neglect or violation of military duty. Indeed, the motives for payment of the fine are more urgent and the duress under which it is paid is more formidable in the former than they would be in the latter class of cases.

The intimation in the act of congress that the money thus paid was "for the procuration of a substitute," was obviously designed to render the provision under consideration as little odious as possible, a sort of plea of justification for accepting money instead of men, whenever motives of fear, private pleasure or interest, or hostility to the war should induce the drafted man to adopt that alternative. For like reasons of public policy the act in question does not in terms designate the provision for the payment of money as a fine in terms, though it partakes of the nature of a fine, was obviously designed as such, and may properly be thus regarded.

The provision for the payment of money cannot be regarded as a tax levied upon the drafted man, since congress has no authority to discriminate against them by imposing upon them an undue proportion of the expenses of the war, though it may impose a fine upon them for not rendering military service.

There was no element of public advantage, benefit, or welfare blended with the payment made by the defendant. On the contrary, such payment, as we have seen, tended to weaken and demoralize the army, and bring the government into disrepute and peril. The defendant paid the $300 in controversy as a fine imposed for non-performance of a personal obligation to the government, exclusively for his own individual benefit and as his individual debt. He might have entered the army and avoided this expenditure; but rather than do so, he chose to pay the fine imposed for such neglect. He has enjoyed the benefit secured by the sum he paid, and cannot rightfully compel others to reimburse him for such payment. To do so would be to require the inhabi-

tants of the defendant town to pay a tax to indemnify him against loss for neglecting to perform a personal public duty,—to tax the drafted men of that town, who entered the military service or paid a substitute, in order to reimburse him the fine he paid for the privilege of staying at home.

A tax levied for such a purpose is not only a tax on A. for the private benefit of B., but it is also a tax on A. to reimburse B. the amount of the penalty he paid for not performing a personal public duty.  A statute authorizing the imposition of such a tax lacks the distinguishing characteristic of all constitutional enactments that involve the necessity of taxation, a public purpose, and is, therefore, unauthorized by the constitution.  Opinions of Justices, 58 Maine, 601 and 604.

The previous adjudications of this court in respect to the constitutionality of statutes authorizing towns to pay bounties, etc., afford no sanction for the statute under consideration.  Those cases are clearly distinguishable from the one at bar, as the public welfare was intimately blended with the private interest of the individuals sought to be benefited by the reimbursement.  The present plaintiff's case has no such association.

While the legislature may rightfully authorize the imposition of a tax to encourage and aid drafted men in rendering military service to the government, it has no constitutional power to authorize a tax to prevent them from performing such service.